Andrew L. **MANNING**, et al., Plaintiffs,

v.

**THE SCHOOL BOARD OF HILLSBOROUGH COUNTY, Florida (formerly Board of Public Instruction of Hillsborough County, Florida), et al., Defendants.**

No. 58-3554-CIV-T-17.

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 4, 1998.

---

**4.** The amendment became effective November 1, 1993. *United States v. Munoz-Realpe*, 21 F.3d 375 (11th Cir.1994).

Victor A. Bolden, Marianne Engelman Lado, Jacqueline A. Berrien, NAACP Legal Defense & Educational Fund, Inc., New York, NY, Warren H. Dawson, Dawson & Griffin, P.A., Tampa, FL, for Andrew L. Manning, Shayron B. Reed, Sanders B. Reed, plaintiffs.

Thomas M. Gonzalez, Thompson, Sizemore & Gonzalez, P.A., Walter Crosby Few, Few & Ayala, P.A., Tampa, FL, for Board of Public Instruction of Hillsborough County, FL, defendants.

## ORDER

KOVACHEVICH, Chief Judge.

This cause comes before the Court on Defendants' Motion to Alter or Amend Judgment (Docket No. 822)[1] and the Plaintiffs' response (Docket No. 823).

As a preliminary matter, Defendants explain that they have begun to take appropriate steps, including scheduling meetings to conduct open discussions with Plaintiffs and soliciting input from the parents of school attending children and other members of the public. Moreover, Defendants emphasize that they are reviewing desegregation techniques which are available to them. These are certainly positive steps and the Court is anxious to see the results.

Nevertheless, Defendants request a further explanation of this Court's October 26, 1998, Order so that the parties will have a common interpretation of the Order. Defen-

dants state that, "[d]espite numerous readings of the Order, the Defendants and their representatives and counsel are in substantial doubt as to exactly what actions they must, or indeed, may, take in order to satisfy the Court." However, Defendants stress that they do not seek a specific description of what means they may employ to meet the Court's requirements. In other words, Defendants seek a specific description of "the Court's requirements," not a means for meeting those requirements.

Notwithstanding, Defendants' second paragraph of their memorandum states:

The Court suggests that the Defendants "should evaluate desegregation tools which have been successful in other districts." (Order, page 109). It refers to "desegregative devices" which were available to the Defendants, but not used. (Order, page 61). It does not, however, describe these opportunities, nor does it provide any other direction.

Defendants then argue in a footnote, "[i]n fact, neither the Plaintiffs nor the Court has pointed to any specific action which the Defendants could or should have taken to meet their obligation to desegregate to the 'maximum extent practicable.'" Contrary to Defendants' assertions, Defendants seek to be told, specifically, which desegregation tools to use.

■ The Court has already pointed to deficiencies in Defendants' desegregation performance and will not, in fact, describe "specific action" which can be taken. However, if Defendants are unable to discern the appropriate measures to take on their own, the Court will hire experts of its own choosing to carry out the task for Defendants, at Defendants' expense, of course.

■ In addition, Defendants emphasize that during the course of this litigation, Plaintiffs stated that Defendants were complying with the Court's Desegregation Or-

1. Defendants file their Motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Rule 59(e) permits a district court to entertain a motion to alter or amend a judgment. A party can invoke the rule to direct a court's attention to matters such as newly discovered evidence or a manifest error of law or fact. A motion to alter or amend a judgment is not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment, or to present evidence that was available earlier. Consequently, Defendants' Motion will be treated solely as a Motion for Clarification.

der, and that the plan was effective. Moreover, Defendants improperly raise arguments already considered by the Court concerning Plaintiffs' failure to object to Defendants' actions. Significantly, the Court, not Plaintiffs, must determine whether unitary status has been attained. Any posturing that has taken place between the parties is inconsequential to this Court's determination. Perhaps this concept has hindered Defendants' accomplishments over the years. Defendants' obligations remain until "the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." *See Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 436, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). A judicial determination as to whether Defendants have accomplished their affirmative duty was never sought until this Court prodded Defendants to see where this case was going. Consequently, the fact that Plaintiffs once argued in a brief that the schools were desegregated, in order to prevent action sought by Defendants, should not be repeatedly emphasized to the Court.

Equally as unproductive, "Defendants ask the Court to consider that 'inaction' by a party who believes it to be consistent with the Court's directive may be error, but is not apathy. They ask as well that the Court remember that the Defendants did not rely solely on the Court's *ex parte* oral interpretations of its Order, but on a more public form of information as well." Defendants continue that the Court should acknowledge that the Court did not require any alteration of Defendants' action since 1974.

If Defendants' feelings have been hurt by the Court's Order denying unitary status; perhaps they expect an apology from the Court. Defendants should refrain from filing any additional motions in an attempt to explain why the Court should not unfairly characterize their inaction. There is a very complex and significant task to be accomplished in Hillsborough County. If attaining unitary status is going to be impaired because Defendants feel that they have been personally offended by constructive, and blatantly honest, criticisms, there are larger problems afoot in Hillsborough County.

On page 19 of their Memorandum, Defendants argue, "[i]f the Court intends a holding in its Order that the Defendants' chances of attaining a finding of unitary status were doomed by acts not taken in 1976, by Board members and administrators who are no longer associated with the School board, then they ask for reconsideration of that conclusion." Apparently, this point needs to be made crystal clear: this case concerns the operations of a public school system, not individuals personally. The school system must be operated on a nondiscriminatory basis and all vestiges of the prior constitutional violations must be eliminated to the maximum extent practicable. This is true regardless of the particular individuals acting for the School Board at any given time. To even suggest that acts not taken by the particular individuals currently sitting on the School Board should not be considered is absolutely ridiculous. The school system does not magically become desegregated simply because the ball has changed hands. Eliminating the vestiges of past discrimination to the maximum extent practicable is not limited to the tenure of individual Board Members. The Court will not address similar arguments raised in Defendants' Memorandum. This is not productive.

Despite Defendants' use of the instant Motion to defend their actions which have already been ruled upon, Defendants have raised genuine issues regarding their obligations. Moreover, Defendants discuss the fact that the 1971 Desegregation Order did not provide much detail and they explain that the School Board needs additional guidance with regards to their obligations.

*I. The Nature of the Court's Conclusions Relating to Student Assignment.*

■ In the October 26, 1998, Order, the Court stated that while demographics have played a significant role in Hillsborough County, the Court is not convinced that a shift in demographics and residential patterns explains the racial imbalance in the Hillsborough County school system. The Court also emphasized that the increase in

the black population was not nearly as drastic as the increases experienced in cases cited by Defendants. Because the school system has not yet achieved unitary status, Plaintiffs are entitled to a presumption that the current disparities are the result of prior segregation. Defendant has the burden to prove otherwise.

In their Memorandum, Defendants ask the Court to consider

> whether its inability to determine the extent of the role played by demographics in producing numbers which are central to its concerns, and, by extension, its inability to conclude with certainty whether the schools of Hillsborough County are in fact unitary, are the product of Defendants' counsel's unartfulness in presenting their evidence, as opposed to the reality which that evidence sought, but failed, to portray. Specifically, the Defendants ask the Court to consider whether or not additional or different data are needed, and/or whether further hearings would be helpful.

■ Undoubtedly, additional data is required. However, this is not simply a "numbers game" and the Court went to great lengths to explain that Defendants have not demonstrated a good faith commitment to desegregating the school system. In order to achieve constitutional compliance, a school district is obligated to comply, in good faith, with the court's desegregation decree and "take whatever [affirmative] steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. School Bd. of New Kent County,* 391 U.S. 430, 437–39, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

■ Defendants need to provide the Court with additional data concerning how successful their desegregation efforts have been. Significantly, Defendants should provide the Court with statistics regarding the racial compositions of the schools in the county from 1995 to the present. Defendants should explain whether racial compositions have improved or worsened. If they have worsened, Defendants should explain why, and what is going to be done. Defendants should provide the Court with additional data concerning their majority to minority trans-

fer program and explain whether this has been successful. Defendants should look at other school districts similar in size to Hillsborough County and determine whether the transfer program in Hillsborough County can be improved. Defendants should gather current statistics in connection with their magnet schools and programs and determine whether the circumstances have improved since 1995 and whether Defendants' predictions have proven accurate. Moreover, Defendants should compare the quality and success of their magnet schools and programs with other school districts similar in size.

In its Order, the Court directed Defendants' attention to the various other ethnic groups represented in Hillsborough County. Defendants correctly assert that, until a constitutional violation has been alleged and established as to a specific minority, the Court may not issue injunctive relief. However, Defendants can certainly provide accurate statistics to carry their burden. While the parties have been arguing that, for instance, one school is 90% black, it may support Defendants' other demographics statistics to have accurate statistics showing that the school is really 60% black, 20% Hispanic, 5% Asian, 5% other, and 10% white. The County has changed a great deal since 1971 and the Court is interested in a true picture of the composition of the schools, not because a constitutional violation has been alleged, but because Defendants are trying to present an accurate, and current, picture of the school system.

■ The breakdown of the different ethnic groups is not crucial to Defendants attaining unitary status and Defendants can present their case anyway they choose. Defendants also seek guidance as to the significance of particular race ratios. Admittedly, the "standard" used has been the Court's 80%/20% ideal. As noted above, the actual populations of ethnic groups in the County may illustrate that a new "standard" should be used or additional factors considered. The use of the 40% threshold is to measure Defendants' effectiveness at desegregating the County schools. Because the parties have not challenged whether the population

as a whole is roughly 80%/20%, the Court has continued to use this to determine Defendants' progress. Defendants' progress entails not only desegregating the schools because of past discrimination, but demonstrating that it has strategically planned to avoid discrimination in the future. In other words, Defendants do not have to ensure that every school in the system is precisely 80% white and 20% black. However, the Court must have a reference point to evaluate Defendants' efforts. Therefore, Defendants are not held steadfastly to any particular race ratios, but must have reasonable, and supportable, explanations for schools that are substantially disproportionate in their racial composition. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 26, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

Defendants claim that the Court fails to provide a "threshold by which racial identifiability may be identified as **requiring** action." Defendants have the burden to prove that the school system has been desegregated. Until unitary status has been declared, Defendants are required to take affirmative steps to desegregate the system. The Court cannot say that every time an individual school becomes 41% black, action must be taken at that school. But when the system is evaluated in its entirety and several schools are becoming more and more segregated, Defendants must be able to explain why. A 20% variance from the "ideal race ratios," which have yet to be proven inappropriate as a starting point, indicates that a school is on its way to becoming majority black. The School Board should become concerned enough to investigate its cause, especially if several schools are becoming majority black. The Court has not denied Defendants' request to be declared unitary simply because a school has reached a particular race ratio. However, the Court did issue its ruling based on the increase in the number of schools which indicate a source of concern and Defendants' failure to take affirmative steps or demonstrate that they have strategically planned for the future. It is not the role of the Court to engage in strategic planning. The Court's role is to oversee the strategic planning that is entirely the responsibility of the School Board.

Another comparison to the efforts taken by the school district in *Freeman* is instructive. In *Freeman*, the school district's desegregation plan was adopted by the district court in 1969. *Freeman v. Pitts*, 503 U.S. 467, 471, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). "**Remarkable** changes in the racial composition of the county presented [the school district] and the District Court with a student population in 1986 far different from the one they set out to integrate in 1969." *Id.* at 475, 112 S.Ct. 1430 (emphasis added). The racial proportions of the student population was further described as a "**striking change.**" *Id.* (emphasis added). "The school system that the District Court ordered desegregated in 1969 had **5.6%** black students; by 1986 the percentage of black students was 47%." *Id.* (emphasis added). The county also experienced "**radical**" demographic changes, and, as a result, the northern half of the county became predominately white and the southern half became predominately black. *Id.* "In 1970, there were 7,615 nonwhites living in the northern part of DeKalb County and 11,508 nonwhites in the southern part of the county. By 1980, there were 15,365 nonwhites living in the northern part of the county, and 87,583 nonwhites in the southern part." *Id.* The district court in *Freeman* found that the demographic shifts had an **immense effect on the racial compositions** of the county's schools. *Id.* at 476, 112 S.Ct. 1430.

When the school district sought a declaration of unitary status in 1986, the district court noted that the school district "**had taken specific steps to combat the effects of demographics** on the racial mix of the schools." *Id.* at 479, 112 S.Ct. 1430. The school district, "on its own initiative, started an **M–to–M program in the 1972 school year.** The program was a **marked success.** Participation increased with each passing year, so that in the 1986–1987 school year, 4,500 of the 72,000 students enrolled in [the school system] participated." *Id.* (emphasis added). In **1986,** the district court found that **19%** of the students in the school system had an integrated learning experience as a

result of the M–to–M program. *Id.* Moreover, as early as **1980**, the school district in *Freeman* voluntarily instituted a magnet school program in the schools located in the middle of the county in order to attract students from the segregated northern and southern parts of the county.

The district court found that the school district's actions "achieved maximum practical desegregation from 1969 to 1986." *Id.* at 480, 112 S.Ct. 1430. The district court in *Freeman* also stated that it was "convinced that any further actions taken by defendants, while the actions might have made marginal adjustments in the population trends, would not have offset the factors that were described above and the same racial segregation would have occurred at approximately the same speed." *Id.* at 480–81, 112 S.Ct. 1430 (quoting the district court's opinion).

■ Conversely, in the case at hand, the increase in black students has only been from 17.4% in 1970, to 19.4% in 1990. This is hardly "striking," "radical," or "remarkable." Furthermore, the M–to–M transfer program has been a marked failure. Defendants had not granted one (1) M–To–M transfer as of 1996. Finally, Defendants failed to develop magnet schools and programs, except for the magnet program at Tampa Bay Technical High School, until 1993. This Court is not convinced that Defendants' inaction has not contributed to the degree and magnitude of segregation in Hillsborough County's schools. Significantly, each instance of a failure or refusal to fulfill Defendants' "affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 459, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). If you choose *not* to decide, you have made a choice.

■ The central question which Defendants seek to have clarified is whether Defendants have an obligation to use **any** desegregative techniques in response to racial ratios which they did not cause through historical or current unlawful inaction. The only way the Court can possibly answer Defendants' question is with another question: "Who has made the determination that Defendants did not cause the imbalances?" This Court has not made that determination.

Although Defendants spend a great deal of effort trying to convince the Court that Plaintiffs, at one time, made that determination, Defendants have missed the point of this litigation. Defendants cannot unilaterally determine that they have not caused the current segregation in the schools. That is precisely why they must continue to take affirmative action to desegregate the schools until they seek unitary status and the Court finds that the school system is unitary. Moreover, Defendants cannot assume that demographic shifts are necessarily independent of prior unconstitutional practices. "The school district bears the burden of showing that no [ ] causal link exists [between the racial imbalances and the prior unconstitutional practices and unconstitutional inaction], and absent such a showing, the district must continue to make affirmative efforts to remedy racial imbalances while subject to court order." *Lockett v. Board of Educ. of Muscogee Co. Sch. Dist.*, 92 F.3d 1092, 1099 (11th Cir.1996).

■ District courts must assert jurisdiction over school systems in order to ensure compliance with the courts' remedial orders and the Constitution until such time as a district court determines that the vestiges of past discrimination have been eliminated to the maximum extent practicable. In determining whether Defendants have satisfied their burden of proving that the current imbalances in the school system are not the result of present or past discriminatory action, the Court must consider:

(1) whether the racial imbalances are traceable, in a proximate way, to constitutional violations, (2) whether the school district has exhibited a record of full and satisfactory compliance with the decree, and (3) "whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court's decree and to those provisions of the laws and the constitution that were the predicate for judicial intervention in the first place."

*Lockett*, 92 F.3d at 1097 (quoting *Freeman*, 503 U.S. at 494, 112 S.Ct. 1430). The Court

has considered these factors in its previous order and found that the racial imbalances in Hillsborough County appear traceable to Defendants' prior unconstitutional practices and the continued unconstitutional inaction. Moreover, the Court emphasized that Defendants have not demonstrated a good faith commitment to desegregating the County schools.

"The good faith requirement assures parents, students, and the public that they will be protected against further injuries or stigma, by making 'it unlikely that the school district would return to its former ways.'" *Id.* at 1100 (citations omitted). "[A] finding of good faith ... reduces the possibility that a school system's compliance with court orders is but a temporary constitutional ritual." *Id.* (quoting *Morgan v. Nucci,* 831 F.2d 313, 321 (1st Cir.1987)). Defendants have not satisfied this requirement.

The Court cannot tell Defendants which specific means to employ. However, their obligations should be clear. Defendants must make efforts to affirmatively desegregate the school system and submit proof that they have, in fact, done so to the maximum extent practicable. An integral part of this proof will be documentation of the strategic planning Defendants have engaged in to ensure that discrimination does not occur in the future. A history and pattern of good faith and affirmative efforts will speak for itself. School districts, such as the one in *Freeman,* typically seek unitary status and provide proof of what the school district has done in the past, and, that it is continuing to do everything practicable, but that the demographic changes have been so overwhelming that the continued efforts are ineffective, and, the school district should be released from supervision. Conversely, Defendants have furnished proof that they have done some things in the past, but provided nothing to suggest that the Court should not look at all the things it hasn't done, or the ineffectiveness of what it has done, because there has been a 2% shift in the demography of Hillsborough County.

■ Defendants have expressed additional concerns because the Court's Order "has imposed on the Defendants several new but unspecified reporting obligations." Specifically, Defendants seek clarification because the Court stressed that Defendants should continue to consider busing burdens in assignment and site selection decisions. The Court is not requiring Defendants to monitor particular statistics in connection with the busing burden. However, the Court wants to emphasize that the busing issue should be considered in Defendants' future decisions. The Court feels compelled to caution Defendants that busing children is of great public importance and failure to account to the public for its decisions could become a huge obstacle down the road. Moreover, the busing issue is tied to the area of site selection, which has been specifically addressed in this Court's Order and the Supreme Court opinions sited therein. Defendants must consider these interrelated aspects of the school system operations, both now and over the long haul.

Plaintiffs specifically raised the issue of Defendants' failure to document decisions with regards to site selection. Wouldn't it be great if, in the future, Defendants were able to say: "Here it is; we looked at the land value, population, growth patterns, budget, racial compositions, etc., *and even more, without having been ordered by the Court to do so. We considered the burdens imposed on all students in the system; here is what has happened,* along with other important considerations".

Nevertheless, Defendants shall provide the Court with the statistics discussed above concerning racial compositions in the schools since 1995, M-to-M transfers, and comparisons to other districts of similar size. If the statistics demonstrate that the number of schools which are racially imbalanced has increased, Defendants should brief the Court on why this has taken place, who is responsible for taking action, what action will be taken in the future, whether additional experts are needed, and other relevant facts to demonstrate that Defendants have fully embraced their obligations, have a strategy, and will have success in the future. Moreover, if the number of magnet programs in Hillsborough is deficient in comparison to similar

districts, Defendants should be prepared to explain why.

Defendants also ask the Court to alter its Order and declare the school system unitary in all areas except for student assignment. However, the Court declines to do so at this time because of the new and creative efforts that the Court foresees being implemented in Hillsborough County. "[O]ne of the prerequisites to relinquishment of control in whole or in part is that a school district has demonstrated its commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution." *Freeman*, 503 U.S. at 490, 112 S.Ct. 1430. The Court expects that Defendants' future efforts will impact the various operations of the school system and the Court deems it appropriate to retain supervision. The Court has already discussed the relationships between some of the *Green* factors and further discussion is unnecessary.

Finally, the Court certainly cannot provide the parties with a specific date on which the school system will be declared unitary. Nevertheless, the Court anticipates the parties will have the 2000 Census data available to them by the time Defendants have had sufficient time to demonstrate a pattern of good faith compliance and prove that supervision is no longer necessary. Accordingly, it is

**ORDERED** that Defendants' Motion to Alter or Amend (Docket no. 822) be **DENIED**; alternatively, the Court has treated Defendants' Motion as a Motion for Clarification which has been addressed above and granted only in part.