OMNIPOINT COMMUNICATIONS, INC., Plaintiff,

v.

Foster TOWNSHIP, Defendant.

No. 3:CV–97–1850.

United States District Court, M.D. Pennsylvania.

April 30, 1999.

James A. Swetz, Stroudsburg, PA, for plaintiff.

Albert F. Maier, Jr., Freeland, PA, Sean P. McDonough, Kingston, PA, for defendant.

## MEMORANDUM

VANASKIE, District Judge.

Plaintiff Omnipoint Communications, Inc. (Omnipoint) filed this action under 42 U.S.C. § 1983 and the Telecommunication Act of 1996, 47 U.S.C. § 332(c)(7), contending that the defendant Foster Township (Foster) improperly denied Omnipoint's request for a special exception to erect a 195 foot monopole on a two-acre lot in a C–1 zoned area. (Dkt. Entry 1.) In its complaint, Omnipoint sought mandamus relief in addition to monetary damages. On April 1, 1998, Omnipoint moved for partial summary judgment as to liability and for the issuance of peremptory judgment of mandamus. (Dkt. Entry 14.) On April 9, 1998, Foster moved for partial summary judgment on the § 1983 claim (Count II), contending, *inter alia,* that a § 1983 claim for monetary damages cannot be based upon a violation of the Telecommunications Act. (Dkt. Entry 21.)

Because the denial of Omnipoint's request to erect its 195 foot monopole was not supported by substantial evidence, Omnipoint's motion for partial summary judgment on the Telecommunications Act claim will be granted and a peremptory judgment of mandamus will be entered against Foster. Because a violation of the Telecommunications Act is not redressable by way of a § 1983 claim and Omnipoint has not alleged facts sufficient to support a cognizable civil rights claim, Foster's motion for partial summary judgment on the § 1983 claim will be granted.

## I. BACKGROUND

In enacting the Telecommunications Act of 1996, Congress extended federal court jurisdiction to local zoning decisions affecting the placement of communications antennae needed to create a seamless system for the transmission of wireless communications. To understand why Congress made the federal courts the fora for adjudication of zoning disputes, a brief narration of the manner in which personal wireless communications systems operate is instructive:

> [Personal Communication Services] and wide area [specialized mobile radio services] operate by transmitting low power radio signals between mobile, wireless units, and fixed antennae mounted on towers, buildings, or other structures. Signals generated by mobile transmitters are fed to electronic cabinets at the base of the antennae, where they are connected to telephone lines, over which the transmission is routed to ordinary telephone equipment located anywhere in the world. A single antenna and its related equipment cabinet are called a "cell site."

> The distance over which the low-power signals emitted by mobile transmitters may be effectively broadcast to fixed, cell site antennae is limited to a relatively small geographic area, called a "cell." Accordingly, an overlapping, interconnected quilt of cells must be stitched together to provide seamless coverage. Where there is a "gap" in the pattern, the user's call is "dropped" or "disconnected."

*Sprint Spectrum L.P. v. Jefferson County,* 968 F.Supp. 1457, 1460 (N.D.Ala.1997).

On April 3, 1997, Omnipoint applied to build a 195 foot monopole on a two-acre parcel of land situated in a C–1 district in Foster Township. (Pl's SMF (Dkt. Entry 17) ¶¶ 8–9.)[1] This application was denied by a Foster Township zoning officer, who determined that a communication tower is not a permitted use in a C–1 district. (*Id.* ¶ 10.) The zoning officer indicated that Omnipoint needed a special exception in

---

1. Citation to a paragraph of only one party's statement of material facts ("SMF") signifies that the other party has admitted the averments contained in that paragraph.

order to erect its 195 foot tower on the proposed site. (*Id.*)

Omnipoint then filed a request for a special exception with the Foster Township Zoning Hearing Board (hereinafter referred to as "the Board"). (*Id.* ¶ 13.) Hearings on Omnipoint's request were conducted on September 3, 1997 and October 1, 1997. (*Id.*) At the time of these hearings, Omnipoint amended its application for a special exception to include an appeal of the zoning officer's determination that its proposed monopole was not a permitted use in a C–1 district. (*Id.* ¶ 14.) Omnipoint argued that its proposed monopole qualified as a public utility permitted use. (*Id.*)

The Board determined that Omnipoint's proposed use was not a permitted public utility use. (*Id.* ¶ 15.) Moreover, the Board also denied the request for a special exception, finding that Omnipoint had failed to meet the requirements for a special exception. (*Id.* ¶ 15.) In particular, the Board found:

5. The Zoning Code of Foster Township provides for expressed standards or specific requirements in Section 604 of Article 6, and in Section 1510.2 of Article 15. Among the standards set forth therein is one that requires a demonstration that public services and facilities such as streets, sewage disposal, water, police and fire protection shall be adequate for the proposed use. In the instant manner there was no demonstration that police, fire or emergency protection would be adequate for the proposed use, or that the township would be able to handle such accidents or emergencies which may arise at the site during its construction, maintenance, servicing or repair. There was no demonstration that the township has such emergency trained personnel to deal with such problems. Also, the 10 foot wide dirt lane was not demonstrated to be adequate for the conveying of such public services. Thus, the application falls short of demonstrating adequate access and services for such matters, as required under Paragraphs B and C of Section 604 of Article 6, and 1 and 2 of Section 1502.2 of Article 13.

6. The other uses and activities in the vicinity are primarily residential, or of a rural-farming nature, as demonstrated by both the Applicant and the protester. The proposed 195 foot lattice tower, with concrete pad for BTS unit, is not harmonious to other activities existing in the vicinity in terms of its location and size and the nature of the operation involved. Therefore, the applicant does not meet the requirement of Paragraph D in Section 604, and Paragraph 3 of Section 1510.2.

7. The other uses and activities existing in the vicinity will not be harmonious with the proposed use in terms of the character and height of the buildings and structures. Thus, the applicant does not meet the requirements of Subparagraph E of Section 604, and Paragraph 4 of Section 1510.2.

8. The Applicant's case, exhibits and site plan makes no mention of provisions for offstreet parking at the facility, as is required in Paragraph B of Section 603 of Article 6, Site Plan. Section 1116 of Article 11 requires that any commercial use or nonresidential use of a structure, building or land not specifically listed within Section 1115 of the ordinance shall provide for one offstreet parking space for every 300 square feet of gross floor or lot area.

9. Furthermore, Section 1106 of Article 11 requires for grading for proper drainage and surfacing to provide for durable and dustless surfaces for offstreet parking areas. The Applicant's plan does not contain any such provision and thus the Applicant has failed to meet other specific criteria for its proposed use. Hence, the Applicant's application does not meet any of these requirements of the Zoning Ordinance.

(Def's Exs. (Dkt. Entry 18) Ex. 1.)

Prior to denying Omnipoint's request for a special exception, Foster had granted

applications for special exceptions by Pennsylvania Cellular Corp. and 360 Communications for the construction of two communication towers in a C–1 district. (Pl's SMF (Dkt. Entry 17) ¶ 16.) Foster contends that the other applications concerned a "largely unpopulated, densely wooded area on top of a mountain," and that Pennsylvania Cellular Corp. and 360 Communications both satisfied all of the requirements for a special exception. (Def's Answer to SMF (Dkt. Entry 25) ¶ 16.)

## II. DISCUSSION

### A. Omnipoint's Motion for Summary Judgment on the Telecommunications Act Claim

#### 1. Foster Township Zoning Ordinance

Omnipoint's proposed site is located within a C–1 district (Conservation District). A communication tower is not a permitted use within a C–1 district; rather, the Ordinance specifically provides that a communication tower is a use permitted by special exception. (Def's Exs. (Dkt. Entry 18) Ex. 2, Zoning Ordinance, §§ 506.1–.2.) The Ordinance also provides that "any building, structure and/or use" must be located on a lot with an area of two acres or more. (*Id.* § 506.4.)

Under Section 604 of the Foster Township Zoning Ordinance, the following standards are considered to determine whether to grant a special exception:

A. The proposed use shall not jeopardize the objectives of the Community Development Objectives of this Ordinance nor shall it adversely affect the health, safety and welfare of the public and/or environment;

B. Public services and facilities such as streets, sewage disposal, water, police and fire protection shall be adequate for the proposed use;

C. Existing and future streets and access to the site shall be adequate for emergency services, for avoiding undue congestion, and for providing for the safety and convenience of pedestrian and vehicular traffic.

D. The relationship of the proposed use to other activities existing or planned in the vicinity shall be harmonious in terms of the location and size relative to the proposed use, and the nature and intensity of the operation involved;

E. The relationship of the proposed use to other activities existing or planned in the vicinity shall be harmonious in terms of character and height of buildings, walls and fences so that the use, development and value of adjacent property is not impaired;

F. The proposed use shall not be more objectionable in its operation in terms of noise, fumes, smoke, vapors, gases, odors, heat, glare, vibration, lighting or electrical disturbances than would be the operation of any permitted use in the district nor shall it constitute a "General Nuisance" as so defined in Article 2 of this Ordinance; and

G. Any other reasonable conditions and safeguards, in addition to those expressed in this Ordinance, may be imposed by the Zoning Hearing Board in the interest of protecting health, safety, and welfare of the public.

(Def's Exs. (Dkt. Entry 18) Ex. 2.) Pursuant to Section 1510.2, the Board is to grant a special exception only if the proposed use conforms with applicable standards and the following criteria:

1. Public services and facilities such as streets, sewers, water, police, and fire protection shall be adequate for the proposed use and or development.

2. Existing and future streets and access to the site shall be adequate for emergency services, for avoiding un-

due congestion, and for providing for the safety and convenience of pedestrian and vehicular traffic.

3. The relationship of the proposed use and/or development to other uses and activities existing or planned in the vicinity shall be harmonious in terms of the location and site relative to the proposed operation, and the nature and intensity of the operation involved.

4. The relationship of the proposed use and/or development to other activities existing or planned in the vicinity shall be harmonious in terms of the character and height of buildings, walls and fences so that the use, development and value of adjacent property is not impaired.

5. The proposed use and/or development shall not be more objectionable in its operations in terms of noise, fumes, odors, vibrations or lights than would be the operations of any permitted use in the district.

6. The proposed use and/or development shall not be injurious to the public interest.

(Def's Exs. (Dkt. Entry 18) Ex. 2.) The Board determined that Omnipoint had failed to satisfy these special exception requirements and its application was denied.

## 2. The Telecommunications Act of 1996

 The Telecommunications Act of 1996 was designed to promote competition in the personal telecommunications industry by limiting the ability of local authorities to regulate and/or control the expansion of telecommunications technology. *See Gearon & Co. v. Fulton County*, 5 F.Supp.2d 1351, 1353 (N.D.Ga.1998); *Cellco Partnership v. Town Plan & Zoning Comm'n*, 3 F.Supp.2d 178, 181 (D.Conn. 1998) ("Congress passed the Telecommunications Act in an effort to increase competition in the telecommunications industry by placing limits on local zoning boards'

regulation of the placement, construction, and modification of personal wireless service facilities."); *Smart SMR of N.Y., Inc. v. Zoning Comm'n of the Town of Stratford*, 995 F.Supp. 52, 56 (D.Conn.1998) ("Congress passed the Act in order to increase competition in the telecommunications industry."); *Sprint Spectrum L.P. v. Town of Farmington*, No. 97–863, 1997 WL 631104, at *2 (D.Conn. Oct. 6, 1997) (finding that Congress intended to limit local authority in favor of new telecommunication technology); *Sprint Spectrum L.P. v. Jefferson County*, 968 F.Supp. 1457, 1461 (N.D.Ala.1997) (noting that the Act was intended to open market and promote competition). Although the Telecommunications Act placed certain restrictions upon local regulatory bodies, it did not completely preempt their ability to control zoning decisions in relation to telecommunications services. *See Town of Farmington*, 1997 WL 631104, at *2. Instead, Congress sought to balance the interests in promoting wireless technology with the rights of the local zoning authorities to maintain the integrity of land use rules. *See* 47 U.S.C. § 332(c)(7)(A) ("Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."); H.R.Conf.Rep. No. 104–458, 104th Cong., 2d Sess. 207–08 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 222 ("The conference agreement creates a new section 704 which prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement."). This balancing of interests was accomplished by imposing a few procedural requirements and two substantive limitations on local zoning authorities. To assure that the federally-imposed requirements and limitations were followed, Con-

gress authorized federal court review of local zoning decisions impacting the provision of wireless communication services. 47 U.S.C. § 332(c)(7)(B)(v).

There are essentially two procedural safeguards contained in the Telecommunications Act. First, it requires that any adverse decision against a personal wireless services provider be in writing. 47 U.S.C. § 332(c)(7)(B)(iii); *Gearon & Co.*, 5 F.Supp.2d at 1354; *AT & T Wireless Servs. of Fla. v. Orange County*, 982 F.Supp. 856, 859 (M.D.Fla.1997); *see also PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp.2d 1052, 1062 (N.D.Ill.1998) (finding that written decision need not be extensive and must only inform an applicant of the decision). Second, the decision must be supported by "substantial evidence." 47 U.S.C. § 332(c)(7)(B)(iii).

There are also two substantive provisions of the Telecommunications Act which protect personal wireless services providers and limit the authority of local zoning authorities. First, state or local government agencies "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Second, state or local government agencies "shall not unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I).

 In this case, Omnipoint contends that Foster violated both the procedural safeguards as well as the substantive provisions of the Telecommunications Act. First, Omnipoint contends that the decision denying Omnipoint's request for a special exception lacked substantial evidence. Second, Omnipoint argues that Foster's refusal to grant a variance effectively prohibited the provision of personal wireless services. Finally, Omnipoint asserts that Foster's denial of the special exception constituted unreasonable discrimination between providers of functionally equivalent services. Because I find that Penn Forest's decision was not supported by substantial evidence, Omnipoint's arguments concerning alleged violations of the substantive safeguards need not be addressed.[2]

2. In any event, Omnipoint's substantive arguments are without merit. First, Foster has not prohibited personal wireless services. *See Omnipoint Communications, Inc. v. City of Scranton*, 36 F.Supp.2d 222, 233 (M.D.Pa. 1999) ("[A] single decision by a local regulatory agency is insufficient to demonstrate a prohibition of personal wireless communication services. The courts have uniformly held that § 322(c)(7)(B)(i)(II) is violated only where the local regulatory agency creates a general ban against all personal wireless communication services."). Second, Omnipoint has failed to demonstrate that Foster has unreasonably discriminated between functionally equivalent providers. In part, Omnipoint's argument rests upon the faulty premise that it should be provided the same treatment as a public utility. As I explained in rejecting this contention in the *City of Scranton* case, the legislative history of the Telecommunications Act clearly indicates that the anti-discrimination provision "was intended to apply only to personal wireless services providers." *Id.* at 234. As in the *City of Scranton* case, "Omnipoint's reliance upon the right of conventional telephone providers (public utilities) to place its poles and wires in any district is not

relevant to this inquiry under the Telecommunications Act." *Id.; see also Omnipoint Communications, Inc. v. City of Scranton*, 36 F.Supp.2d 222, 233 (M.D.Pa.1999). Omnipoint also argues that Foster

has allowed two cellular-analog competitors to erect towers in a C–1 district only 2 and ½ miles away from Omnipoint's proposed site. Omnipoint's proposal is for a similar tower within the same zoning district. Foster Township cannot treat Omnipoint and its analog competitors differently. The decision does not explain any rational basis for the disparate treatment. By treating Omnipoint and its competitors differently, Foster Township has discriminated in violation of the Act.

(Pl's Supp. Br. (Dkt. Entry 15) at 11.) Foster contends that the two cellular applicants had satisfied all of the requirements for their special exceptions and that the two approved cellular tower sites were "located in a largely unpopulated, densely wooded area on the top of a mountain." (Def's Answer to SMF (Dkt. Entry 25) ¶ 16.) It cannot be said that Penn Forest acted unreasonably in distinguishing between an application for a tower in a rural

■ The substantial evidence standard is the traditional standard of review applied to agency determinations:

[S]ubstantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Under this definition, a court may not displace an agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Likewise, in the context of the [Telecommunications Act of 1996], the court must affirm a board's decision "even if the court would decide the matter differently."

*Cellular Tele. Co. v. Zoning Bd. of Adjustment of Borough of Ho–Ho–Kus*, 24 F.Supp.2d 359, 365–66 (D.N.J.1998) (citations omitted); *see also PrimeCo Personal Communications*, 26 F.Supp.2d at 1063 (" 'Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept ·as adequate to support a conclusion.' ") (quoting *Geske & Sons, Inc. v. NLRB*, 103 F.3d 1366, 1374–75 (7th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997)). The local zoning authority bears the burden of demonstrating that substantial evidence existed to support its denial. *Cellco Partnership*, 3 F.Supp.2d at 182.

■ To enable meaningful judicial review, a written decision cannot simply rely upon conclusory statements, but must provide some evidentiary basis to support each statement. *See Virginia Metronet, Inc. v. Board of Supervisors of James City County*, 984 F.Supp. 966, 973 (E.D.Va. 1998). Moreover, the "generalized concerns" voiced by opponents will not provide substantial evidence for an adverse decision against a personal wireless services provider. *See PrimeCo Personal Communications*, 26 F.Supp.2d at 1063 ("Under this standard, unsupported constituent testimony opposing cellular tower locations generally will not satisfy the substantial evidence test."); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township*, 20 F.Supp.2d 875, 880 (E.D.Pa. 1998) ("Generalized concerns and conclusive statements within the record about the aesthetic and visual impacts on the neighborhood do not amount to substantial evidence."); *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732, 745 (C.D.Ill.1997) ("But under substantial evidence review, the mere existence of opposition is insufficient to support an agency decision against a request. Instead, the agency must rely upon more than a scintilla of evidence that a decision against the request is warranted under the agency's criteria."); *Western PCS II Corp. v. Extraterritorial Zoning Auth. of the City and County of Sante Fe*, 957 F.Supp. 1230, 1236 (D.N.M.1997) (finding that "generalized concerns" of five neighbors failed to constitute substantial evidence for denial of requested application); *BellSouth Mobility Inc. v. Gwinnett County*, 944 F.Supp. 923, 928 (N.D.Ga.1996) (holding that generalized concerns do not amount to substantial evidence). *But see AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 430–31 (4th Cir.1998) (suggesting that public outrage standing alone can constitute substantial evidence to deny a zoning request).

■ Two hearings were conducted in this matter. Omnipoint represented that it intended to lease a lot on Oley Valley Road owned by Norman Ackerman and erect a communication tower on that lot. Omnipoint discovered that the Foster

area as opposed to an application for a tower in a more residential area. As explained in *City of Scranton*, Congress did not " 'intend that if a State or local government grants a permit in a commercial district, it must grant a permit for a competitor's 50–foot tower in a residential district.' " 36 F.Supp.2d at 235 (quoting H.R.Conf.Rep. No. 104–458, 104th Cong., 2d Sess. 208 (1996), 1996 U.S.C.C.A.N. 124, 221–22). The question remains, however, whether there was substantial evidence for Foster's determination that Omnipoint had failed to meet the requirements for a special exception.

Township Ordinance required minimum lot size of two acres, thus Omnipoint and Ackerman sought approval from the Foster Township Planning Commission to subdivide a 2 acre lot from Ackerman's approximately 18 acres of land. (Tr. 9/3/97 hearing (Dkt. Entry 18) Ex. 1, at 17.)

Omnipoint presented testimony regarding the general design and specifications of the proposed tower. (*Id.* at 3, 7.) Omnipoint admitted that the final specifications for the tower would be determined at the site after boring and soil tests had been conducted. (*Id.* at 9.) Omnipoint assured the Board that the proposed tower would be constructed according to all relevant codes and specifications. (*Id.* at 12.)

Omnipoint presented testimony that a gravel access road would be constructed between Oley Valley Road and the proposed site. (*Id.* at 20.) Omnipoint indicated that it was currently working with the Planning Commission on the specifics regarding the access road to make sure that it would be capable of handling emergency vehicles. (*Id.* at 22.) Omnipoint represented that the access road would be constructed in accord with the specifications provided by the Planning Commission. (*Id.* at 23.) Moreover, Omnipoint also stated that it would maintain the road according to the standards necessary for emergency vehicles. (*Id.* at 20.)[3]

Omnipoint also testified that the proposed tower would be surrounded by fencing with a height of 6 to 8 feet, depending upon the wishes of the Board. (*Id.* at 26.) Omnipoint also stated that it would install any lighting that the Board deemed necessary. (*Id.* at 28.) In terms of the surrounding neighborhood, Omnipoint noted that there were not many houses in the immediate vicinity of the Ackerman property. Generally, the surrounding property was a combination of open spaces and forested property. Omnipoint assured that Board that it would maintain the vegetation as a means to buffer the proposed tower from Oley Valley Road. (*Id.* at 39.) The proposed tower was approximately 2000 feet from Ackerman's residence. (*Id.* at 40.)

Norman Ackerman testified that there were no other houses on his side of Oley Valley Road in the vicinity of the proposed tower site. (*Id.* at 44.) Mr. Ackerman admitted that Mary Witerall owned a property across from his property. (*Id.*) Mr. Ackerman stated that Mary Witerall's home was 1000 feet from Oley Valley Road, and even farther from the proposed tower site. (*Id.* at 65.) Mary Witerall, who objected to the proposed tower, admitted that she lived a "good city block" from Oley Valley Road. (*Id.* at 65.)[4] Understandably, Witerall was upset because the proposed 195 foot tower would be across from her residence. (*Id.* at 65.)

In order to demonstrate that the proposed tower would not alter the character of the surrounding land, Omnipoint presented testimony that the proposed tower would not involve an ongoing commercial enterprise, such as a manufacturing facility would entail. (*Id.* at 67.) The proposed tower was an unmanned facility. (*Id.*) There would be no additional automobile or pedestrian traffic caused by the proposed tower. (*Id.*) Omnipoint indicated that the landscape would be maintained in a manner that provided a forested buffer between Oley Valley Road and the proposed tower itself. (*Id.*)

---

3. There was some concern regarding the access road and potential run off. Omnipoint reiterated that it would construct the road according to applicable state and local codes. (*Id.* at 43.) Omnipoint also repeated that the Planning Commission was working with it with respect to the design of the road and that the Planning Commission was requiring that Omnipoint maintain the road. (*Id.* at 55–56.)

4. Witerall owned 23 acres across the road from the Ackerman property. (*Id.* at 73.) Some of her complaints focused upon potential watershed or wetland concerns and related fears about contamination of the water table. (*Id.* at 71.) These concerns were addressed at the second hearing on October 3, 1997.

Because Omnipoint and the Planning Commission were still in the process of completing approval for the subdivision, the Board recessed the hearing. On October 1, 1997, the hearing was reconvened. By that time, the Planning Commission had approved the subdivision proposal. (Tr. 10/1/97 hearing (Dkt. Entry 18) Ex. 4, at 9–10.)[5] At that hearing, Omnipoint presented the testimony of Gerald Fisher, a registered land surveyor who had worked on the project. Mr. Fisher testified that the home of Mary Witerall, the objector at the September hearing, was approximately a quarter of a mile from the proposed tower site. (*Id.* at 11.) Mr. Fisher also testified that a wetlands delineation had been done and that the proposed site would not endanger any wetland area. (*Id.*) Mr. Fisher also indicated that there would be no sewage system for the proposed unmanned tower site and that Omnipoint had applied to DER for a waiver of a septic system. (*Id.* at 19–21.)

Omnipoint then presented the testimony of Thomas Marino, the construction superintendent. Mr. Marino gave general specifications for the concrete foundation for the proposed tower and assured the Board that he had never encountered any water table problems in relation to the ten to twelve foot depths required for the proposed tower's foundation. (*Id.* at 25–27.)[6] Mr. Marino also testified that the proposed tower would withstand winds of 70 mph, or, if covered with ½ inch of ice, winds of 61 mph. (*Id.* at 28.) Mr. Marino also indicated that the proposed tower would be designed in a manner to blend into its surroundings and that Omnipoint would be willing to paint it a different color if the Board desired. (*Id.* at 30–31.)

Michael Oser, an acquisition specialist, testified that the proposed site was located in a reservoir area in which there were no residences, except for Ackerman and Witerall. (*Id.* at 61.) Oser admitted that there were other residences in the general area located adjacent to and further along Oley Valley Road. (*Id.* at 70.) Oser conceded that there were likely other sites within Omnipoint's search ring that could be used for the proposed tower. (*Id.* at 72–73.)

In terms of safety, Marino testified that Omnipoint required their crews to be trained. The contractors building the tower would be trained in rescue procedures used to get individuals down in the event of an accident. (*Id.* at 76.) Moreover, Marino also noted that harnesses and straps were used in connection with the tower construction and maintenance. (*Id.*) Marino represented that Omnipoint never used a sole individual for maintenance and there would always be at least one person on the ground. (*Id.* at 78.)

In response to this testimony, Mary Witerall, the objector from the September hearing, again testified. She stated that she had spoken with 30 people with residences within one mile of the proposed tower site. (*Id.* at 82.) Although Witerall claimed that these individuals objected to the proposed tower, the Board refused to accept her testimony because none of those individuals appeared at either hearing to voice their opposition. (*Id.*) Witerall also expressed concerns about (1) her property value decreasing; (2) the character of the neighborhood being altered; and (3) noise caused by the proposed tower's BTS unit. (*Id.* at 85.)

After considering all of this testimony, the Board denied Omnipoint's request for a special exception, finding that Omnipoint had failed to bear its burden. This determination is not supported by substantial evidence. First, as to the concerns about the access road and emergency services,

---

**5.** The Planning Commission had also recommended that the special exception be granted. (*Id.* at 92.)

**6.** Mr. Marino admitted that the exact specifications had not yet been determined because

Omnipoint did not want to expend $8,000 to $12,000 for geotechnical surveys without knowing that the Board would approve the project. (*Id.* at 31.)

the record demonstrates that Omnipoint and the Planning Commission worked together on designing the proposed road in a manner that would allow emergency vehicles access to the proposed tower site. Omnipoint also agreed to maintain the access road in a good condition. Therefore, the Board lacked substantial evidence for its conclusion that the access road was inadequate.[7]

Moreover, in relation to police, fire and emergency services in general, Omnipoint presented testimony that a wire fence would be placed around the property to protect the public from harm and Omnipoint from vandalism. Moreover, Omnipoint stressed that its construction crews and maintenance crews were trained in safety and rescue procedures. Thus, Omnipoint demonstrated that their proposed tower would not be a burden upon existing fire, police or emergency services. Furthermore, the Board had already granted special exceptions for the construction of other communication towers. Police, fire and emergency services were necessarily deemed adequate for those towers and there is nothing in the record to suggest that Omnipoint's unmanned tower would present any additional burden.

The Board also concluded that the proposed tower was not harmonious with other activities in the surrounding vicinity. In this regard, the Board found that the "character of the neighborhood is that of basically rural, agricultural and residential makeup." (Def's Exs. (Dkt. Entry 18) Ex. 1, ¶ 14.) The Board also concluded that the proposed use, i.e., the communication tower and BTS unit, were not in accord with the rural agricultural and residential nature of the surrounding properties. The Board then concluded that, in terms of character and height, the proposed tower

itself was not harmonious with the surrounding buildings and structures.

A local zoning authority may deny a personal wireless service provider's request to construct and erect a communications tower where a legitimate visual or aesthetic concern exists. See Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490, 495 (2d Cir.1999) (finding that aesthetic or property value concerns, if supported by substantial evidence, provide a permissible basis to deny a personal wireless service provider's request for a variance); Smart SMR, 995 F.Supp. at 59 ("A zoning authority acts reasonably if it had a legitimate basis [such as visual, aesthetic or safety concerns] for denying a permit to provide services."); AT & T Wireless Servs. of Fla., Inc. v. Orange County, 23 F.Supp.2d 1355, 1362 (M.D.Fla. 1998) ("It is within the prerogatives of a local government to determine that a tower (or steeple) is too imposing for a particular neighborhood."). For example, in Cellular Telephone Co. v. Zoning Board of Adjustment of the Borough of Ho–Ho–Kus, 24 F.Supp.2d 359 (D.N.J.1998), Cellular Telephone applied for a conditional use variance to build a 127 foot monopole in a residential district. Id. The Zoning Board denied the request, finding that such a monopole would adversely affect the visual aesthetics of the surrounding residential neighborhood. In finding that substantial evidence existed to support this determination, the court noted that the Zoning Board considered the following evidence:

> In addition to the fact that the site is zoned for residential uses, the closest residence is only 285 feet from the proposed monopole, with the next closest at 290 feet. Indeed, Mr. Kasler testified that *87 homes are located within 1000 feet of the monopole and 23 within 500 feet*, the Borough was residential in na-

---

7. The Board also found that Omnipoint had failed to demonstrate that there would be adequate off-street parking. This finding is without merit. The record clearly demonstrates that the proposed tower was unmanned. There was no need for off-street

parking. In any event, Omnipoint was only using a small portion of the leased 2 acres. Thus, it is clear that Omnipoint could provide ample off street parking if the Board so demanded.

ture and the Master Plan intended that it continue to be so.

*Id.* at 370 (emphasis added). In addition, the Zoning Board was provided photographs of the surrounding neighborhood and opinions by real estate appraisers that property values would decrease if the monopole were constructed. The court affirmed the Zoning Board's determination that the proposed monopole would have a detrimental impact on the surrounding residential area.

In sharp contrast to *Ho–Ho–Kus,* where there were 87 homes within 1000 feet of the proposed monopole, the record does not reflect a single residence within 1000 feet of the proposed tower. Instead, Norman Ackerman's residence is approximately 2000 feet from the proposed site, while Mary Witerall's residence is approximately 1200 feet from the proposed site across Oley Valley Road. (Tr. 9/3/97 hearing (Dkt. Entry 18) Ex. 3, at 40; Tr. 10/1/97 hearing (Dkt. Entry 18) Ex. 4, at 11, 16.) In fact, other than Ms. Witerall's reference to 30 residences within one mile of the proposed tower site, the record is devoid of any reference to the number of residences on Oley Valley Road. While the Board found that the character of the surrounding area was, in part, residential, the record lacks substantial evidence to support this conclusion. In fact, the two individuals present at the hearing, Ackerman and Witerall, owned tracts of land encompassing approximately 18 and 23 acres, respectively. Moreover, the district was not zoned as a residential district, but as a conservation district with permitted uses of agricultural uses, sales of agricultural products, forestry, greenhouses and nurseries, animal kennels, state game lands and parks, public uses, public utility facilities and single-family detached dwellings. (Ordinance (Dkt. Entry 18) Ex. 2, § 506.1.) Although there may have been some homes within the district, it clearly did not have a residential character. *Cf. Orange County,* 23 F.Supp.2d at 1362–63 (affirming denial of special exception request to construct a 99–foot tall church steeple to house a communications antennae in a single family home district (R–1AA)).

In a similar case, *AT&T Wireless PCS, Inc. v. Winston–Salem Zoning Board of Adjustment,* 172 F.3d 307 (4th Cir.1999), AT & T sought a special use permit to erect a 148 foot monopole in an IP district, which was zoned for "institutional and public purposes." The zoning board denied the special exception, finding that the proposed tower would have had an adverse impact upon the surrounding neighborhood as well as upon the historic value of the Hanes House, a home that was being considered for placement in the National Register of Historic Places. The district court determined that the zoning board lacked substantial evidence to support its determination, finding:

> The ... property is 38 acres, primarily wooded. The proposed communication facility would be located in the northwest quadrant. The site surrounding the proposed facility is heavily wooded with trees estimated to be 60 to 85 feet in height and is located approximately 500 feet from the nearest residence. The proposed pole would be 148 feet tall, seven feet wide at the base, with a three foot diameter at the top, gray in color, and without lights. The tower was designed to be as low and concealed as possible in an effort to reduce concern of visibility to surrounding neighbors.... A ten-by-twelve foot equipment base would be located at the base of the tower. The tower would be surrounded by an eight-foot wooden fence landscaped with 54 evergreen plants, shrubs, and four deciduous trees.

*AT&T Wireless PCS, Inc. v. Winston–Salem Zoning Board of Adjustment,* 11 F.Supp.2d 760, 765 (M.D.N.C.1998). Thus, the district court concluded that AT & T had presented sufficient evidence that its proposed tower would be in harmony with the surrounding area. *Id.* at 768.

On appeal, the Fourth Circuit reversed the district court's determination. The

court noted that the tower would be within 500 feet of the nearest resident. *AT & T Wireless PCS,* 172 F.3d at 314. Moreover, the court emphasized that AT & T's tower would be the first tower in this *residential* area. The court also indicated that the visibility of the proposed tower would increase in winter months as it was buffered by deciduous trees. *Id.* Eight citizens testified to the negative visual impact and a mortgage banker testified to the adverse effect the proposed tower would have on surrounding real estate values. *Id.* Finally, the Zoning Board agreed to consider a petition signed by 145 local residents opposing the proposed tower. *Id.* Importantly, the record also reflected that the proposed tower would be located a mere 148 feet from the Hanes House, thereby impacting upon the historic value of that residence. *Id.* at 314. There was concern that placement of the proposed tower so close to the Hanes House could endanger its chances of securing placement in the National Register of Historic Places. *Id.*

In this case, Omnipoint's proposed tower will be constructed in a forested corner of an 18 acre tract. The nearest residence is over 1000 feet from the proposed site, twice the distance as the proposed tower at issue in *Winston–Salem.* Unlike *Winston–Salem,* where deciduous trees created a buffer, the Omnipoint's proposed tower would have a buffer of evergreen trees, which will remain constant through the winter months. Moreover, the Board has allowed two other cellular towers to be erected in the *same* C–1 district, as opposed to *Winston–Salem* where no other towers had ever been constructed in the area. Moreover, *Winston–Salem* had testimony from a mortgage banker concerning the potential adverse impact upon property values. In *Winston–Salem,* eight residents testified against the tower and

presented a petition with 145 signatures. In this case, only a single resident testified in opposition and presented a petition with approximately 30 signatures, which the Board refused to accept. Finally, this case lacks the concerns present in *Winston–Salem* that the proposed tower would adversely affect historic property. Therefore, there is simply not substantial evidence to support Foster's refusal to grant Omnipoint's application for a special exception. *Cf. Iowa Wireless Servs., L.P. v. City of Moline,* 29 F.Supp.2d 915, 922 (C.D.Ill.1998) (finding that Zoning Board's conclusion that tower would cause urban blight was negated by the fact that three towers already exist in the general area); *Village of Fox Lake,* 26 F.Supp.2d at 1065 (finding that Zoning Board could not rely upon "common sense" that 150–foot tower would be an "eyesore" to tourists and neighbors).

Moreover, this is not a case in which large numbers of protesting citizens spoke before the Zoning Board regarding their view that the proposed tower would create a visual blight. *See Town of Oyster Bay,* 166 F.3d at 496 ("[W]e find that the few generalized concerns with 'aesthetics' cannot serve as substantial evidence on which the Town could base the denials."); *Iowa Wireless Servs.,* 29 F.Supp.2d at 922 ("[T]his Court finds that the generalized comments of three citizens who speculate that a fourth tower will impair the aesthetic quality of the area do not amount to 'substantial evidence' within the meaning of the statute, since there are already three towers near the proposed location."); *Pine Grove Township,* 20 F.Supp.2d at 880 ("Generalized concerns and conclusive statements within the record about the aesthetic and visual impacts on the neighborhood do not amount to substantial evidence.").[8] Nor is there any competent

---

8. In *Pine Grove Township,* Judge Van Antwerpen stated that "a review of Pennsylvania law reveals that both economic and aesthetic considerations are not a sufficient basis for denying an application for a *special exception.*" *Id.* at 880 (emphasis added). In that case, the

Ordinance in question provided that a party moving for a special exception had to demonstrate that the proposed use would "not adversely affect the character of the general neighborhood, nor the conservation of property values, nor the health and safety of resi-

evidence concerning the adverse effect on surrounding property values that would result if the proposed tower were erected. *See Town of Oyster Bay*, 166 F.3d at 496 ("A few generalized concerns about a potential decrease in property values ... does not seem 'adequate to support a conclusion' that the permits should be denied."). In short, the only evidence concerning the "harmony" of the surrounding properties came from Mary Witerall. These "generalized concerns" regarding aesthetics and property values fail to provide substantial evidence for the Board's determination that the proposed tower would not be harmonious with the surrounding properties.

In this regard, Foster had already permitted two other towers to be erected in the same C–1 district, albeit in an allegedly more secluded wooded area "on top of a mountain." Omnipoint represented that it was unable to use those towers to fill its coverage gap. This assertion went unchallenged. Regardless of where Omnipoint's proposed tower was placed, its height would necessarily make it visible to residents of Foster Township. Thus, although Omnipoint admitted that there were other properties within its search ring upon which a tower could be erected to alleviate the coverage gap, there is no evidence that such a location would be any less visible or objectionable to those residing within one mile of it.

In summary, the denial of the special exception is not supported by substantial evidence. Because the Board lacked sub-stantial evidence to support its conclusion that Omnipoint had failed to meet the requirements for a special exception, Omnipoint's motion for partial summary judgment will be granted and a peremptory writ of mandamus will be issued.[9]

## B. Foster's Motion for Summary Judgment on the § 1983 Claim

In *Omnipoint Communications, Inc. v. Penn Forest Township*, 42 F.Supp.2d 493, 501–07 (M.D.Pa.1999), I recently determined that a party may not maintain a § 1983 claim for violation of the Telecommunications Act. *Id.* at 506. Moreover, I concluded that Omnipoint had failed to allege sufficient facts to support a § 1983 claim for procedural due process violations, substantive due process violations, and commerce clause violations. *Id.* at 506–07.

Likewise, in this case, Omnipoint may not maintain a § 1983 claim for violations of the Telecommunications Act. Nor may Omnipoint maintain a § 1983 claim for violation of procedural due process rights as the Third Circuit has determined that Pennsylvania's scheme for challenging zoning determinations provides adequate process. *Id.* at 507. Moreover, in terms of a potential substantive due process claim, Omnipoint has failed to allege that the Board's denial was motivated by "bias, bad faith, improper motive, racial animus, or the existence of partisan political or personal reasons." *Id.* (quoting *Midnight Sessions, Ltd. v. City of*

---

dents or workers on adjacent properties and in the general neighboring properties." *Id.* at 879 n. 5. Despite this provision, Judge Van Antwerpen stated that even if the objectors had established to a "high degree of probability" their aesthetic concerns, the Zoning Board could not, under Pennsylvania law, allow those aesthetic concerns to influence its decision. *Id.* (citing *Heck v. Zoning Hearing Bd. for Harvey's Lake*, 39 Pa.Cmwlth. 570, 397 A.2d 15, 19 (1979); *Soble Constr. Co. v. Zoning Hearing Bd. of the Borough of East Stroudsburg*, 16 Pa.Cmwlth. 599, 329 A.2d 912, 917 (1974)). Thus, even if the record disclosed more than "generalized concerns" regarding the aesthetic impact of the proposed tower, which it does not, the Board could not have relied upon such aesthetic concerns in denying Omnipoint's application for a special exception.

9. While the Board will be directed to grant Omnipoint's application for a special exception, the Board retains the authority to impose such reasonable conditions on its grant of a special exception as are consistent with Foster's zoning ordinance, such as lighting, fencing, etc.

*Phila.,* 945 F.2d 667, 683 (3d Cir.1991), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992)). Finally, Omnipoint has also failed to alleged a commerce clause claim as there are no allegations that Foster implemented or maintained a policy or regulation that "benefitted in-state economic interests and burdened out-of-state economic interests." *Id.* at 509 n. 21 (quoting *Smart SMR,* 995 F.Supp. at 60). Therefore, for the reasons set forth in *Penn Forest Township,* Foster's motion for summary judgment on the § 1983 claim will be granted.

### III. CONCLUSION

Because Foster's decision to deny Omnipoint's application for a special exception was not supported by substantial evidence, Omnipoint's motion for summary judgment on Count I will be granted and a peremptory judgment of mandamus will be entered against Foster. Moreover, because Omnipoint has failed to allege facts that would support a 1983 action, Foster's motion for summary judgment on Count II will be granted. An appropriate Order is attached.